Francis P. and E. Edith McCULLOUGH et al., Appellants in No. 74–1997,

v.

REDEVELOPMENT AUTHORITY OF the CITY OF WILKES–BARRE, a Public Corporation, et al.

Francis P. and E. Edith McCullough et al.

v.

REDEVELOPMENT AUTHORITY OF the CITY OF WILKES–BARRE, a Public Corporation, et al., Appellants in No. 74–1998.

Francis P. and E. Edith McCullough et al.

v.

REDEVELOPMENT AUTHORITY OF the CITY OF WILKES–BARRE, a Public Corporation, et al.

Appeal of Theodore R. ROBB and James T. Lynn in No. 74–1999.

Nos. 74–1997 to 74–1999.

United States Court of Appeals, Third Circuit.

Argued March 17, 1975.

Decided July 9, 1975.

Gelb & Myers, Morey M. Myers, Robert J. Nolan, Scranton, Pa., for plaintiffs-appellants and cross-appellees.

Flanagan, Doran, Biscontini & Shaffer, Charles A. Shaffer, Wilkes-Barre, Pa., for State defendants-appellees and cross-appellants.

Wallace H. Johnson, Asst. Atty. Gen., S. John Cottone, U. S. Atty., Laurence M. Kelly, Asst. U. S. Atty., Scranton, Pa., Carl Strass, Larry G. Gutteridge, Dept. of Justice, Washington, D. C., for Federal appellees and cross-appellants.

Before ALDISERT, GIBBONS and GARTH, Circuit Judges.

GARTH, Circuit Judge:

We are called upon to decide whether, under any of the various theories advanced by plaintiffs, they were entitled to have their residences which had been flood-damaged *acquired*[1] by the South Wilkes-Barre Redevelopment Authority rather than just *rehabilitated.* The district court entered judgment for all the defendants on all claims except that it directed the defendants to comply with certain provisions of the Urban Renewal Handbook.[2] Inasmuch as we hold that the plaintiffs are not entitled to have their properties *acquired* regardless of compliance with the Handbook provisions, we reverse so much of the district court's judgment in favor of the plaintiffs and direct that judgment for the defendants be entered without exception as to all claims.

## I. FACTS

In June of 1972, Hurricane Agnes struck Pennsylvania and neighboring states causing severe and widespread property damage. One of the areas which experienced severe flooding was the Wyoming Valley of Pennsylvania which is drained by the Susquehanna River. The Susquehanna overflowed its banks extensively flooding the downtown and "South Wilkes-Barre" sections of the City of Wilkes-Barre.

Shortly thereafter, the United States Department of Housing and Urban Development (HUD), along with other federal and state agencies, began to coordinate efforts for disaster relief and recovery.[3] A separate urban renewal project

---

1. Paragraph 2 of the complaint reads:

   "2. This is an action on behalf of each individual Plaintiff as an owner of real property within the South Wilkes-Barre Urban Renewal Project Area. This action seeks a declaration that the continued operation of the South Wilkes-Barre Urban Renewal Project without the acquisition of Plaintiffs' properties is in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments; the Equal Protection Clause of the Fourteenth Amendment; the United States Housing Act of 1949, as amended, 42 U.S.C. § 1441 *et seq.*; and the Civil Rights Act of 1871, 42 U.S.C. § 1983. It further seeks an injunction enjoining Defendants, acting individual [*sic*] or in concert, from allowing the project to operate without acquiring Plaintiffs' properties; and an order to the Defendant Wilkes-Barre Redevelopment Authority requiring them to acquire Plaintiffs' properties in the operation of the South Wilkes-Barre Urban Renewal Project."

2. The district court's order of judgment dated June 27, 1974 reads:

   "1. Judgment for Plaintiffs is hereby granted to the extent that the Defendants are directed to comply with the United States Department of Housing and Urban Development Rehabilitation Handbook known as RHA 7210.1, Chapter 1, Sections 1, 2, 5–8; RHA 7207.1, Chapters 1 and 2; and RHA 7225.1 within 120 days of the date of this order.

   2. Judgment for Defendants is hereby granted on all other issues, claims, and relief requested by the Plaintiffs."

   A stay of the judgment pending appeal was entered on August 26, 1974.

3. The defendants are identified in the Complaint as:

   1. The Redevelopment Authority of Wilkes-Barre, a Pennsylvania corporation organized under 35 P.S. § 1701 *et seq.,* charged with executing the urban renewal and redevelopment activities of Wilkes-Barre. The individual defendants Case, Kramer, Long, Wall, Rushton, and Rubinstein are members of that State Authority.

   2. The City Council of Wilkes-Barre, a municipal corporation, which exercises the legislative power of the City. The individual defendants Salwoski, Brader, Burns, Newman, Reid, Trinisewski, and Williams are members of the Council.

   3. Defendant Robb is Regional Administrator of the United States Department of Housing and Urban Development charged with approving federal assistance to the redevelopment activities of the State and City defendants.

was designed for the rehabilitation of South Wilkes-Barre. The responsibility for this project was entrusted to a body known as the Redevelopment Authority of the City of Wilkes-Barre (hereinafter "Authority").

The funding for the South Wilkes-Barre Project was obtained from several sources. The Authority received a planning and survey grant of $936,532 from HUD under Title I of the National Housing Act of 1949, as amended, 42 U.S.C. § 1441 *et seq.* for the purpose of surveying the magnitude of the flood damage in order to prepare an urban renewal and redevelopment project for the South Wilkes-Barre area. On the basis of this survey the Authority prepared a Flood Disaster Urban Renewal Project Plan which, among other things, included the acquisition of certain properties within the Project Area.[4]

In March, 1973, the Authority submitted to HUD a "Combined Part I— Part II Loan and Grant Application" seeking a federal capital grant of $29,518,299. On July 20, 1973, a "Loan and Capital Grant Contract" was exe-

cuted between the Authority and HUD, under the terms of which HUD approved the South Wilkes-Barre Urban Renewal Plan in the amount requested.[5] In addition to the HUD funds, the Commonwealth of Pennsylvania agreed to provide $9,431,000 toward the Project. Under the terms of the contract, the Authority made no financial contribution.

From its inception, it was intended by the various governmental agencies participating in the project, that primary emphasis would be placed on "rehabilitation" of flood-damaged properties rather than their "acquisition".[6] The Wilkes-Barre City Council decided as early as July, 1972 that the policy which should be followed was one of " . . . extensive restoration and rehabilitation and of only limited property acquisition. . . . " In accordance with this policy, the district court found that: "The Urban Renewal Plan provides for the rehabilitation of the maximum number of buildings possible within the Area." Finding No. 15.

The criteria[7] used by the Authority to distinguish between properties to be *re-*

4. Lynn is Secretary of the United States Department of Housing and Urban Development, an agency of the United States, and is authorized to make loans and to grant federal funds to state and local authorities in matters of urban renewal and redevelopment.

4. Finding Nos. 2, 4.

5. Finding No. 10. The contract provided for a capital grant from HUD not to exceed $28,-293,299 and a rehabilitation grant not to exceed $1,225,000. The rehabilitation grant was to assist low income families in the Project Area in the rehabilitation of their properties to conform to property rehabilitation standards. Finding No. 255. This rehabilitation *grant* should not be confused with the rehabilitation *program.* The rehabilitation program involved here was funded through the Small Business Administration (SBA) which provided loans to homeowners rehabilitating their properties. The SBA loans have more favorable terms than HUD rehabilitation loans and normally no standards for rehabilitation are imposed other than the existing building codes. Finding Nos. 220, 234, 235, 292.

6. Finding Nos. 13, 14, 15.

7. The establishment of criteria utilized in making determinations as to which properties

should be acquired was the responsibility of the Authority. HUD established three primary acquisition categories: sub-standard to a degree warranting clearance, elimination of a blighting influence, and attainment of a planning objective. Criteria to determine whether or not a particular property fell within an acquisition category were developed by the Authority. Here, the Authority developed the three criteria set out in the text, the first of which details the considerations satisfying "sub-standard to a degree warranting clearance." *See* HUD's Answer to Plaintiffs' Interrogatory No. 23. *See also,* testimony of Leon Case, Executive Director of the Authority, at 278–79A:

"[The acquisition criteria] . . . originated at the local level in combination of [*sic* 'with'] the Redevelopment Authority and its consultants. It is derived from the policy directive of the City Council, Planning Commission and the Board of Redevelopment Authority which sought a program of general restoration of the neighborhood as opposed to wholesale clearance, so the criteria was devised to prevent a wholesale clearance approach and to limit acquisition to the most severely damaged properties, preferably."

*habilitated* and those to be *acquired* established the following factors as warranting acquisition:

"(a) The structure sustained severe flood damage, such condition being deemed to exist when there are defects in a particular element or group of elements of the foundation and/or piers, exterior walls, roof, or loadbearing items, which defects seriously impair the ability of the component to function in its intended capacity and which require total replacement, reconstruction or extensive repair of the element.

(b) Acquisition to achieve planning objectives.

(c) Acquisition to remove blighting influences; this to include inadequate street layout, incompatible uses or land use relationships, overcrowding of buildings, excessive dwelling unit density, obsolete buildings not economically suitable for modernization or conversion, and other identified health and safety hazards." [8]

The district court found that the reason why the criteria of "sub-standard to a degree warranting clearance" were more strictly defined for this Project than other projects was to " . . . discount or eliminate damage that had occurred to every property, (the general type of flood damage) and to limit the examination of the property to those things which dealt with its structural capacity to remain." [9]

An advisory board (City Review Board) was established to review objections of property owners whose properties were not scheduled for acquisition by the Authority. This Board, in its review, applied the same criteria used by the Redevelopment Authority to determine the eligibility of properties for acquisition. The Authority, however, was not bound by the recommendations regarding acquisition made by the Review Board or by the City Council. [10]

Out of a total of some 4,500 structures in the Project Area, the original number of structures originally scheduled for acquisition by the Authority was 634 (640 parcels). [11] Due to modifications in the Urban Renewal Plan, and the decisions of individual property owners to rehabilitate structures originally scheduled for acquisition, the Authority, by March 1, 1973, had reduced the number of structures it intended to acquire to 315. [12]

The budget for the South Wilkes-Barre project allocated $14,750,000 for property acquisition based on an estimated acquisition of 640 parcels. Despite the reduction in number of properties to be acquired by the Redevelopment Authority since the original estimate, no corresponding revision was made in the budgetary allocation for property acquisition. Thus, a surplus of several million dollars exists in the amount allocated for property acquisition. [13]

The properties owned by plaintiffs are all located within the South Wilkes-Barre Project Area and were not scheduled for acquisition by the Authority. Plaintiffs made repeated requests to have their properties included within the acquisition program but without success. Their eagerness to have their properties acquired is explained by the district court's finding: "An owner of property within the Urban Renewal Project which [property] is acquired receives the fair market value of his property at the time

8. Finding No. 37.

9. Finding No. 47.

10. Finding Nos. 258–260.

11. Finding Nos. 279, 187. Of this number 124 had already been demolished by the Army Corps of Engineers; 328 were found to be substandard to a degree warranting clearance;

101 were to be demolished to remove blighting influences; and 58 were to be acquired for planning objectives. Finding No. 152. The balance of 23 structures were deleted from those to be acquired by City Council action. Finding No. 150.

12. Finding No. 185.

13. Finding Nos. 172, 175, 177, 180, 187.

of acquisition disregarding the amount by which the value of the property depreciated as a result of the flood damage it sustained." [14]   Thus, plaintiffs seek a "*purchase*" of their properties at pre-flood values rather than being required to restore their properties through rehabilitation *loans.*

A full understanding of the practical difference between property being scheduled for acquisition as compared to property being rehabilitated requires a brief analysis of the rehabilitation loan aspect of the Urban Renewal Plan. All properties within the Project Area not acquired *must be rehabilitated* by the property owners in accordance with city codes and ordinances. [15]   Thus, regardless of the cost involved, property owners who remain in the South Wilkes-Barre Project Area must undertake rehabilitation of their damaged structures.

The district court also found that the Authority gave no consideration to the economic feasibility of rehabilitation or to the "debt-carrying capacity" of individual property owners, in determining which properties should be acquired and which rehabilitated. [16]   Hence, even under the liberal terms of government-financed 42 U.S.C. § 1452b loans, it was found that some property owners were unable to bear the financial burden involved in rehabilitation. [17]   The alternative for such individuals is the possible abandonment of their properties. The

Authority classified seventy-five (75) properties, not scheduled for acquisition, as potentially subject to abandonment. [18]

■ Having unsuccessfully sought to persuade the Authority to acquire their properties, plaintiffs commenced this action asserting jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343(3)(4) (civil rights jurisdiction), 5 U.S.C. § 701 *et seq.* (Administrative Procedure Act), and 28 U.S.C. §§ 2201 & 2202 (Declaratory Judgment Act). We agree with the district court that jurisdiction is properly founded upon 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3). [19]   *See Holmes v. New York City Housing Authority,* 398 F.2d 262 (2d Cir. 1968).

■ The district court, after a non-jury trial, filed a comprehensive opinion which rejected plaintiffs' interpretation of the statute (42 U.S.C. § 1452b) and of the Urban Renewal Handbook and refused to order the Authority to acquire plaintiffs' properties. However, its judgment (*see* note 2 *supra* ), while denying the primary relief sought by the plaintiffs, did require that the defendants comply with certain provisions of the Handbook. The plaintiffs appealed (at 74–1997) from the entire order of judgment; the State defendants (at 74–1998) and the Federal defendants (at 74–1999) cross-appealed, but *only from the compliance* provisions of paragraph 1 of the judgment. [20]

14. Finding No. 153.

15. Finding No. 154.

16. Finding Nos. 155, 158, 159.

17. The district court made specific findings of fact in regard to the ability of each of the plaintiffs to finance the necessary repairs to their properties. The court found that the following plaintiffs "[do] not have the financial ability at this time to assume indebtedness for the purpose of rehabilitating [their properties] . . . .": Francis P. McCullough, John and Theresa Sokola, Martin and Sondra Greenberg (*see* note 19, *infra*), and Mary Drey.   Finding Nos. 57, 105, 131, 147.

18. Finding No. 207. The Authority has not as yet determined its policy with respect to abandoned properties. Finding No. 208.

19. In any event, and despite the failure of the parties to allege it, we find jurisdiction under 28 U.S.C. § 1337. *Davis v. Romney,* 490 F.2d 1360 (3d Cir. 1974); *see also Jersey Central Power & Light Co. v. Local Unions 327, etc. of I.B.E.W.,* 508 F.2d 687, 699 n.34 (3d Cir. 1975).

20. After appeal, two motions were made and referred to this panel for disposition. Plaintiffs Martin and Sondra Greenberg moved to withdraw their appeal at 74–1997 and to dismiss the cross-appeals Nos. 74–1998 and 74–1999 (as to them) by reason of the sale of their property. We grant their motion.

All other plaintiffs moved to dismiss the appeal of the Federal appellants at 74–1999 on the ground that the Federal appellants failed *to notify the plaintiffs of the issues appealed* and for failure to comply with briefing sched-

The plaintiffs' arguments fall roughly within the following categories. First, they argue that a proper interpretation of the relevant provisions of the Urban Renewal Handbook would afford each plaintiff the right to have his property acquired by the Authority. Second, plaintiffs argue that, either alone or in combination with their interpretation of the Handbook, they each have a constitutional right (Due Process, Equal Protection) to have their respective properties acquired rather than subjected to rehabilitation.

## II. THE URBAN RENEWAL HANDBOOK

The Handbook's issuance, functions and provisions must be understood to appreciate the arguments made by the parties. At the time of the Hurricane Agnes disaster in Pennsylvania, the provisions governing federal disaster relief were contained in the Disaster Relief Act of 1970, 42 U.S.C. § 4401 et seq.[21] Under the provisions of the Disaster Relief Act of 1970, the President had the authority to appoint a "Federal coordinating officer" immediately upon the designation of a major disaster area. 42 U.S.C. § 4411. This "coordinating offi-

cer" was to function under the Office of Emergency Preparedness. By Executive Order No. 11575, December 31, 1970, 36 F.R. 37, as amended by Executive Order No. 11662, March 29, 1972, 37 F.R. 6563, the President delegated much of his authority under the Act to the Director of the Office of Emergency Preparedness. Subsequently, by Executive Order No. 11725, June 27, 1973, 38 F.R. 17175, as amended by Executive Order No. 11749, December 10, 1973, 38 F.R. 34177, the functions assigned to the Director of the Office of Emergency Preparedness were transferred to the Secretary of Housing and Urban Development.[22] Thus, it is HUD that has officially assumed primary responsibility for administering federal disaster relief efforts from December 1973 and, based on the record in the present case, had de facto assumed that responsibility even earlier.[23]

An explanation of the role played by the Secretary of HUD is a prerequisite to an understanding of why HUD's Urban Renewal Handbook is a focal point of dispute between the parties. Since it is HUD which largely administers federal disaster relief programs, it is HUD's internal operating regulations which plaintiffs urge should govern the admin-

ules of this Court. Despite the disinterest of the Federal appellants in pursuing their cross-appeal, they nevertheless did not withdraw their appeal, purportedly in order to preserve this Court's jurisdiction as to paragraph 1 of the judgment. Since, on the State appeal, we must address ourselves to the compliance section (paragraph 1) of the judgment (which disposition will affect both State and Federal appellants) and, since by reason of our ultimate disposition we believe it in the interest of judicial economy to resolve all open issues, we deny plaintiffs' motion.

21. Some of the statutory provisions which were effective during the period of time relevant for purposes of this case have since been superseded by the Disaster Relief Act of 1974, 42 U.S.C. § 5121 et seq., which took effect on April 1, 1974.

22. The functions were transferred to the Secretary in conjunction with the abolition of the Office of Emergency Preparedness. 1973 Reorganization Plan No. 1 (effective July 1, 1973), 38 F.R. 9579, 5 U.S.C.A. Appendix (1975 Supp.). Executive Order No. 11795, July 11,

1974, 39 F.R. 25939 retains in the Secretary of Housing and Urban Development under the Disaster Relief Act of 1974 virtually the same delegated authority as under the Act of 1970 and Executive Order Nos. 11725 and 11749, supra.

23. When the Authority began organized relief efforts, its first step was to obtain a "Planning and Survey" grant from HUD, under 42 U.S.C. § 1441 et seq. Thereafter, it was again to HUD that the Authority applied when it sought federal funding for its planned Urban Renewal Project. Finally, as found by the district court, it was HUD's Office of Management and Budget which made the decision to use the Small Business Administration's 1% loan program as the primary source of rehabilitation funds for the South Wilkes-Barre Project. Thus, even before the issuance of the Executive Order formalizing the duty of HUD as principal administrator of federal disaster relief assistance, it was HUD that was assuming these responsibilities under the auspices of its various urban renewal programs.

istration of the South Wilkes-Barre Urban Renewal Project. These regulations are embodied in the Urban Renewal Handbook, RHM 7200.1 *et seq.* and particularly RHA 7210.1.[24]

An overview of the relevant provisions of RHA 7210.1 is essential to an appreciation of the issues presented.

Chapter 1, section 1 of 7210.1 defines the objectives of rehabilitation as: the prevention of blight, the preservation of historic properties, and the renewal, improvement and maintenance of properties " . . . so as to justify the provision of financial assistance for the construction or reconstruction of public facilities and improvements. . . ." The Federal defendants' brief at 14 summarizes as follows the balance of Chapter 1, section 1, making appropriate reference to the related provisions of 7207.-1:

> "(1) a rehabilitation area *may* be an entire project *area* or a section of a project *area* in which clearance and redevelopment is the other type of treatment (RHA 7210.1, c. 1, sec. 1 . . . ), i. e., the project *may* contain an area in which everything is rehabilitated and another *area* in which everything is acquired and demolished; (2) a rehabilitation *area* or an *area* within a project, *may* also include spot clearance (RHA 7207.1, RHA 7210.1, c. 1, sec. 1 . . . ); (3) a clearance *area may* include spot rehabilitation (RHA 7207.1, RHA 7210.1, c. 1, sec. 1 . . . ); and (4) restrictive, mandatory requirements are imposed upon acquisition, clearance and redevelopment (RHA 7207.1, RHA 7210.1) . . . ." (emphasis in original).

Section 2 identifies the factors which must be present in a project area for which rehabilitation is the proposed treatment. One of the factors which plaintiffs emphasize in their argument is that " . . . All properties to remain in the rehabilitation area are feasible of upgrading to [acceptable standards]. . . ."[25]

Section 3 (Eligible Costs), section 4 (Contract Services), as well as sections 7 (Rehabilitation Report), 8 (Minimum Requirements during Execution) and 9 (Rehabilitation by the Local Public Agency) do not bear directly upon our discussion and have not been the subject of either analysis or interpretation by the parties.

Section 5 describes Property Rehabilitation Standards and contrasts them with local code standards. The Appendix to this section suggests a form of statement to be incorporated in the Plan prescribing special conditions under which properties which do not conform to the required standards *may* be acquired.

Section 6 (Determining the Feasibility of Property Rehabilitation) is the section on which plaintiffs rely most heavily. They contend that a proper interpretation of this section requires individual "property" and "family" surveys, the results of which determine the feasibility of rehabilitation. If rehabilitation proves to be infeasible, plaintiffs argue that this section, in conjunction with 7210.1, Section 2, mandates acquisition.

Since the parties have focussed on this section of the Handbook in support of their various arguments, we have reproduced the relevant portions as *Appendix I, infra.*

Having recognized the significance of the Handbook and having surveyed its provisions, we now turn to the plaintiffs' argument.

### III.

The plaintiffs argue that the provisions of the Handbook were mandatorily

---

24. No explanation has been afforded as to the alternative use of "RHM" or "RHA" as a prefix to the Handbook provisions. They apparently are used interchangeably, and we attach no significance to such use other than as an aid in identification of the appropriate provision.

25. As appears in the text, plaintiffs contend that their properties are not feasible of upgrading and cannot, therefore, be subject to rehabilitation. Acquisition, they argue, is the only and necessary alternative.

applicable to the South Wilkes-Barre Project. They then proceed to interpret the Handbook provisions, principally § 7210.1, as requiring acquisition of their properties. Specifically they argue:

A. The Handbook requires as a precondition for rehabilitation the feasibility of upgrading [flood-damaged] property to acceptable standards. Feasibility is to be determined by individual physical and family surveys. The plaintiffs claim that such surveys of their properties would reveal the infeasibility of rehabilitation. Rehabilitation being infeasible, they argue that acquisition is mandated.

B. The rehabilitation provisions of the Handbook have their statutory genesis in 42 U.S.C. § 1441 et seq. Under § 1452b an individual must be an "acceptable risk" to be entitled to a rehabilitation loan. Plaintiffs argue that they lack the "debt-carrying" capacity to qualify as "acceptable risks." Since they do not qualify for rehabilitation loans, they cannot rehabilitate their properties—leaving acquisition as the only and mandated alternative.

The State and Federal defendants, while differing somewhat in their respective approaches to the question of whether the Handbook is mandatorily applicable to the Project, in all other respects agree that the plaintiffs have no right to have their properties acquired by the Authority. On the issue of the mandatory application of the Handbook, the State defendants in their cross-appeal take the position that the Handbook is designed only to guide agency personnel. The Federal defendants, while concurring in that interpretation, do not challenge the applicability of the Handbook to the South Wilkes-Barre Project, stating:

" . . . We are of the view that the HUD Handbook is not legally mandatory, except in a contractual

sense, because it is not a 'regulation' and its purpose is to facilitate the internal processes of the program rather than create individual rights. However, . . . it is the Federal Government's position that the HUD Handbook should be complied with to the extent directed by the district court in this case. . . . [S]ince [however] that position is not founded on the reasoning adopted by the district court, we do not oppose the non-federal effort to obtain its reversal. . . . "

Federal Appellee's Brief at 9, n.3.

In answer to the plaintiffs' interpretation of the Handbook, the State and Federal defendants dispute the plaintiffs' "either/or theory"—i. e., that if rehabilitation is not feasible, acquisition must be ordered. The defendants argue that nowhere in either the Handbook or in the Loan and Capital Grant Contract is acquisition mandated. In response to plaintiffs' reliance on the rehabilitation sections of the Handbook, the defendants point out that the rehabilitation aspect of this Project was funded through SBA loans and not under HUD statutes and regulations. They also respond to plaintiffs' argument concerning the necessity for individual surveys by interpreting the rehabilitation provisions of the Handbook as *requiring* only *pre*-"Loan-and-Grant" surveys to determine the rehabilitation feasibility of the *area*, as distinct from requiring individual surveys to determine the rehabilitation feasibility of individual properties.

■ The district court agreed with the plaintiffs' contention that the Handbook provisions were mandatorily applicable and accordingly required compliance by the defendants with certain specified provisions.[26] We do not find it necessary to decide this issue since in our view even if the defendants were required[27]

---

26. *See* note 2 *supra*.

27. We have difficulty in accepting the basis of plaintiffs' argument that the provisions of the Handbook are mandatorily applicable as to them. We are inclined toward the position

taken by the Federal defendants that if the Handbook is binding at all it is binding only as an implied obligation of HUD's contract with the Authority. Plaintiffs are not a party to that contract and cannot claim third party

to apply the various Handbook provisions, the plaintiffs would not thereby be entitled to acquisition of their properties.

## A. *The Handbook Provisions*

The plaintiffs dispute the district court's conclusion that the Handbook's provisions do not require acquisition of individual properties based on each owners cost of rehabilitation and his financial resources, but only require individual "property and family surveys" as aids in forming ". . . a judgment as to the suitability of rehabilitation treatment for an area. . . ." (560a). While we may sympathize with the plight of the plaintiffs, we nevertheless believe that the district court's interpretation is correct.

In support of their interpretation, plaintiffs refer to the Handbook provisions (RHA 7207.1) specifying two basic types of urban renewal treatment: (1) clearance; and, (2) rehabilitation. They recognize that an essential condition for *clearance* is that more than 50 per cent of the buildings be structurally sub-standard to a degree warranting clearance or that there be a combination of "blight-

ed" and "sub-standard" buildings totaling more than 50 per cent of the buildings in the Area.[28] Unless one of these conditions is met, the appropriate treatment is *rehabilitation* and reference must then be made to the Rehabilitation Section of the Handbook, RHA 7210.1.

It was acknowledged by plaintiffs in their brief at 17–18 and at oral argument that, based on the § 7207.1 conditions referred to above, the Project Area ". . . is obviously not a clearance and redevelopment area . . . ," since only 315 of some 4500 buildings are scheduled for acquisition.[29] "Not being a clearance project," plaintiffs admit that, ". . . the South Wilkes-Barre Urban Renewal Project must be a rehabilitation project. . . ." It is thus upon the rehabilitation provisions of the Handbook that plaintiffs base their primary arguments.

For rehabilitation of a residential area, the Handbook requires that, ". . . [A]ll properties to remain in the rehabilitation area are feasible of upgrading to Property Rehabilitation Standards. . . ."[30] Plaintiffs place principal re-

---

beneficiary status under a government contract absent an interest that they be compensated thereunder. Restatement of Contracts § 145; *Commonwealth of Pennsylvania v. National Assoc. of Flood Insurers,* 378 F.Supp. 1339, 1347 (M.D.Pa.1974), *aff'd in part, rev'd in part on other grounds,* 520 F.2d 11 (3d Cir., 1975). For an analogous situation involving a plaintiff's standing to challenge a federal grant of funds to a state agency, *see Johnson v. Morton,* 456 F.2d 68 (5th Cir.), *cert. denied,* 409 U.S. 887, 93 S.Ct. 114, 34 L.Ed.2d 144 (1972).

Nor are we persuaded by plaintiffs' argument that the Handbook provisions confer upon them such important substantive or procedural rights that it was a violation of due process not to apply certain Handbook provisions to the South Wilkes-Barre Project. *Compare Thorpe v. Housing Authority,* 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1968) *and Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959) *with American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970) *and Brennan v. Ace Hardware Corp.,* 495 F.2d 368 (8th Cir. 1974). *See also* V *infra.*

**28.** RHA 7207.1, Chapter 1. (Selection and Treatment of Project Areas.)

**29.** As noted *supra* p. 862, the Wilkes-Barre City Council decided that ". . . the urban renewal policy to be followed should be one of extensive restoration and rehabilitation and of only limited property acquisition . . ." Finding No. 14.

**30.** § 7210.1, Chap. 1, Section 2, provides in relevant part:

> CHAPTER 1. POLICIES AND REQUIREMENTS
> SECTION 2. CRITERIA FOR DESIGNATION OF REHABILITATION AREAS
> This Section identifies the factors which must be present in a project area, or section of a project area, for which rehabilitation is the proposed treatment. . . .
> RESIDENTIAL REHABILITATION
> The following factors must be present in a rehabilitation area which is predominantly residential:
> (1) All properties to remain in the rehabilitation area are feasible of upgrading to Property Rehabilitation. Standards (see 7210.1, Rehabilitation, Chapter 1, Section 5).

liance upon this section in conjunction with the preamble of RHA 7210.1, Chapter 1, Section 6 in arguing that they have a right to acquisition of their properties. While the full text of RHA 7210.1, Chapter 1, Section 6 is reproduced in Appendix I, *infra,* the specific language relied upon by plaintiffs is as follows:

> "The feasibility of rehabilitation means that, for the majority of the properties in the area, there is reasonable evidence that rehabilitation up to the [Local Public Agency's] Property Rehabilitation Standards can be supported by incomes of owner occupants or by rental revenue.

> The physical and financial feasibility of renewing individual properties shall be determined on the basis of (1) property surveys, and (2) family surveys or other appropriate investigations. These surveys shall also be the basis for the establishment of [Property Rehabilitation Standards]."

Plaintiffs take the position that this language from Chapter 6, when combined with Chapter 2's requirement that *all* properties be feasible of upgrading, means that any property, physically incapable of rehabilitation or whose owner lacks sufficient income to make rehabilitation financially feasible, *must* be acquired by the Authority. We disagree.

We believe that the purpose of the property and family surveys is not to determine the physical and financial feasibility of rehabilitating each individual property in the project area but rather to determine *if the area should be scheduled for "clearance and redevelopment" or "rehabilitation".* This conclusion is buttressed by the language of § 7210.1, Chap. 1, Section 6 immediately following the passage just quoted.

(2) The area has residential qualities, desirable location and physical characteristics, and other evidences of vitality assuring that rehabilitation activities will restore the area to a long-term sound condition.

(3) The street and land use pattern can be adapted to present-day needs or objectives.

*"Property Surveys*

> Prior to submission of the Survey and Planning Application, a limited exterior survey shall be made to reach a preliminary judgment as to the suitability of rehabilitation treatment *for the area."* (Emphasis added.)

Less apparent, but also indicative that the Handbook's provisions regarding property and family surveys were intended to apply on an *area* rather an *individual property* basis is the following language contained in the "Family Surveys" subsection.

> ". . . The number, scope, and extent of the surveys shall be kept to the minimum by using existing data to the fullest extent possible . . .."

If each individual property had to be surveyed rather than having a representative survey or sample of the properties within the Project Area, it is difficult to see how the *"number"* of surveys could be kept to a minimum.

Insofar as plaintiffs' argument is based upon the "Family Surveys" subsection of Chapter I, we note that Family Surveys are a permissive [31] alternative means of investigating the feasibility of renewing individual properties, but that the purpose of determining the feasibility of renewing individual properties is not to decide on acquisition or non-acquisition of such properties. Rather it is to determine whether for the majority of properties in the area rehabilitation can be supported by the incomes of the owner occupants or by rental income. While an argument might be made that a resident of an affected area has standing to challenge the entire rehabilitation decision because of the omission of such individual determinations, and thus of the validity of the overall feasibility conclusion, such was not the object of this sec-

---

**31.** The permissive nature of the "Family Surveys" subsection weakens even further plaintiffs' argument that it confers upon them a right to mandatory acquisition of their properties.

tion. The "Family Survey" section is not relevant to the acquisition of individual properties in a rehabilitation site.

■ That these sections of the Handbook apply on an area rather than an individual basis is further confirmed by the interpretation of the administrative agency charged with their enforcement.[32]

Mr. R. A. Traussi, a deputy director of HUD testified:

\*     \*     \*     \*     \*     \*

"The purpose of a financial feasibility determination during the planning stage of a rehabilitation project is to determine if the project is worthwhile to be undertaken, whether it is worthwhile putting Federal funds into this project.

\*     \*     \*     \*     \*     \*

The Department has to make the judgment as to whether it should fund site improvements and public facilities, such as schools, playgrounds, streets, into an area in view of whether the structures in that area are so run down that in five or six years they will be completely, or in ten years, they will be run down and completely more or less useless when we have put an investment of funds for new improvements such as streets and sidewalks which are intended to last for thirty years or more. (377a)

\*     \*     \*     \*     \*     \*

The provision of 7210, if you are referring to the financial feasibility test and planning, is for the benefit of HUD.

\*     \*     \*     \*     \*     \*

. . . It is the information that HUD requests so that they can make an informed judgment as to whether the project is worthwhile undertaking." (382a) [33]

When the provisions of RHA 7210.1 are analyzed, particularly in the context of the Loan and Capital Grant Contract, it appears without question that the only surveys *required* to be made are the *preliminary pre-contract* surveys designed to inform HUD as to the feasibility of the proposed project. The Handbook provisions of Chapter 1, Section 6 estab-

---

**32.** The administrative interpretation of regulations should be given controlling weight unless it is plainly erroneous or inconsistent with the regulation itself. *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945). *Accord, Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). *See, Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *Wetzel v. Liberty Mutual Insurance Co.,* 511 F.2d 199 (3d Cir. 1975), *cert. granted* 421 U.S. 987, 95 S.Ct. 1989, 44 L.Ed.2d 476 (U.S., May 27, 1975).

**33.** At oral argument the following exchange took place between this Court and counsel for the Federal defendants pertaining to the interpretation of the Handbook:

"Counsel: Secondly, I'd like to try to clarify quickly the situation with regard to sections 7210 of the Handbook which I believe are at page 457. This section deals with areas and I believe it is the proper interpretation of what the district court found that the Handbook should be applied, this section of it anyway, on an area basis.
Court: Do I understand that the reference to individual determinations of economic feasibility means that in making the area determination of rehabilitation vs. clearance, one of the factors to be taken into account is the individual financial condition of the residents in the area?
Counsel: Right.
Court: In other words it doesn't mean that the rehabilitation vs. acquisition determination has to be made on an individualized basis?
Counsel: That's right.
Court: The area determination has to reflect the economic makeup of the community.
Counsel: In other words the regulation, not technically the regulation, the Handbook, is to enable HUD to determine whether or not the particular area is conducive to rehabilitation; that is whether it is going to be successful. It is an internal purpose and it is not to particularize with each individual in that area but it is to determine in general for the area whether or not rehabilitation is an appropriate proceeding. And I would like to emphasize that we are not talking about an either/or situation. It is not either/or with regard to individuals or with areas. The fact that a property does not qualify for rehabilitation doesn't mean that it meets the acquisition criteria. There may be some that don't meet either criteria."

lish a time schedule as to when the surveys are to be conducted. Each survey is timed to provide HUD with information to enable it to determine the feasibility of area rehabilitation prior to the execution of the Loan and Capital Grant Contract.

The following provisions of Chapter 1, Section 6 are significant in support of our interpretation that the "Property" and "Family Surveys" are for the benefit of HUD, not the individual property owner.

"*Property Surveys*

*Prior* to submission of the Survey and Planning Application, a *limited* exterior survey shall be made to reach a preliminary judgment as to the suitability of rehabilitation treatment for the area. This survey may be accomplished by driving or walking through the proposed area. Existing data shall be utilized to the fullest extent possible.

*Early* in the *planning* stage, a survey shall be made of the exterior and interior of a *limited number* of typical properties. This survey will provide information which the LPA, in collaboration with HUD will use to formulate tentative PRS and to make a preliminary judgment on the economic feasibility of rehabilitation  .   .  ..

*Prior to submission* of the Part I Loan and Grant Application:

(1) *An exterior survey shall be made of all properties in the area*  .   ..

(2) An interior survey shall be made of properties that cannot be   .   . classified through exterior examination   .   .   ..

*Prior* to the authorization of the Contract for Loan and Grant, HUD will concur in the initiation of final property surveys   .   .   .." (Emphasis added.)

\*      \*      \*      \*      \*      \*

The above quoted language clearly indicates that the surveys contemplated in Chapter 1, Section 6 of the Handbook are all to be conducted prior to HUD's execution of the Loan and Capital Grant Contract. The insistence on pre-contract surveys is consistent with our interpretation that they are designed only to aid HUD in deciding whether or not to enter into a contract with the Local Public Agency.

Having thoroughly considered plaintiffs' arguments based upon various Handbook provisions, we find no provision which expressly or implicitly requires an individual determination of economic feasibility or mandates that property not qualifying for rehabilitation be acquired.[34] Rather, we read the Handbook as *limiting* property acquisition whenever possible.[35]

---

**34.** In view of our interpretation of the Handbook provisions we find little relevance in plaintiffs' additional argument that "prior practices" in other urban renewal projects require individual economic feasibility determinations in this Project. We note, however, that the "prior practices" to which plaintiffs refer occurred in HUD rehabilitation projects funded by Section 312 Loans, 42 U.S.C. § 1452b, rather than SBA programs funded under 15 U.S.C. § 636. *See* our discussion under II. B, *supra.*

**35.** We note that it is the stated policy of HUD to keep the clearance of occupied residential structures to a minimum. This policy finds expression in the Handbook as follows:

§ 7205.1, Chapter 2, Section 2(6) provides in relevant part:

\*      \*      \*      \*      \*      \*

"6. *Residential Clearance Activity.* The clearance of occupied residential structures and the relocation of families and individuals must be minimal and clearly necessary to provide land or space for housing for families of low- and moderate-income or for the development of a new town-in-town. Activities conducted under this section of the Act shall augment the supply of housing particularly for families of low- and moderate-income, rather than reduce it through clearance."

\*      \*      \*      \*      \*      \*

This same policy decision is repeated in § 7207.1, Chapter 1, Section 4(c) of the Handbook:

"c. *Extent of Clearance.* HUD will not concur in the acquisition for demolition of property that is:

Our conclusion, that the Handbook does not establish an "either-or" relationship between rehabilitation and acquisition and does not confer upon individual owners a *right* to have their properties acquired, requires our reversal of so much of the district court's judgment as directs compliance with the Handbook provisions by the defendants. In our discussion of the Handbook provisions we referred to the "pre-contract" requirements (RHA 7210.1, Chapter 1, Section 6) affecting HUD's determinations regarding rehabilitation and funding. It would be a meaningless task to require HUD's feasibility judgment, if not originally made, to be made at this time, long after the project was authorized and funded. As Mr. Traussi testified, the risk of not making such determinations is HUD's risk:

"Q. What risk was run by the Department of Housing and Urban Development in not requiring these feasibility studies to be made?

A. We ran the risk that the other monies that we are putting into the project, into the 67 projects throughout the State that are flood disaster related, that the money that we are putting in for improvements and acquisition and redevelopment would be surrounded by areas that were in dilapidated condition, if the other efforts didn't bring those structures up to standards." (378a)

We see no purpose in requiring mechanical compliance by the defendants with provisions of the Handbook that now have no relevance either to the authorization of the Project, or the relief sought here by the plaintiffs.

### B. *The Statute 42 U.S.C. § 1452b*

■ Nor do we read the *statutory* provisions governing urban renewal and disaster assistance as entitling plaintiffs to acquisition of their properties *as of right*. 42 U.S.C. § 1452b refers to various con-

siderations relevant to the grant of "Rehabilitation Loans".

Section 1452b(a)(3) provides in relevant part:

". . . No loan shall be made under this section unless—

\* \* \* \* \* \*

(3) the loan is an acceptable risk taking into consideration the need for the rehabilitation, the security available for the loan, and the ability of the applicant to repay the loan."

\* \* \* \* \* \*

Plaintiffs argue that, since the statute requires an individualized analysis of the loan applicant (encompassing his need, security, and ability to repay), it follows that an individual who is not an "acceptable risk" for a rehabilitation loan is entitled to have his property acquired. This analysis misconstrues the language of § 1452b and, more significantly, overlooks the fact that the funds for the rehabilitation loan aspect of the Project were appropriated *not* under 42 U.S.C. § 1452b *but rather under* 15 U.S.C. § 636(b), the Small Business Administration's (SBA) disaster loan program.

Even if § 1452b had been the basis for rehabilitation loans in the Project, it does not follow that a property owner who is not an "acceptable risk" for a loan within the meaning of § 1452b(a)(3) is thereby automatically entitled to have his property acquired. All that § 1452b provides, is that one who is not an "acceptable risk" is not entitled to a rehabilitation loan. Nowhere does § 1452b, or any other statutory section (or Handbook provision) to which plaintiffs have called our attention, provide or suggest that property owners who are not entitled to a rehabilitation loan are entitled, as of right, to have their properties acquired by the Authority.

Regardless of the interpretation of § 1452b(a)(3), the fact remains, as we

---

(1) Of such quality and potential use that its retention is compatible with the achievement of the urban renewal plan objectives for the project area.

(2) Capable of being improved and successfully integrated into the project."
\* \* \* \* \* \*

have noted, that the funds available for rehabilitation for the Project were not § 1452b loans but SBA disaster loans. 42 U.S.C. § 1452b(f) [36] gives the Secretary of HUD authority to use any other Federal agency's programs to carry out the objectives of Rehabilitation funding. Pursuant to this authorization, HUD decided to use the SBA's loan program, rather than § 1452b authority, as the source of rehabilitation loans for the South Wilkes-Barre project.[37]

SBA loans, under the terms of 15 U.S.C. § 636(b), provide several obvious advantages when compared to § 1452b loans. SBA loans need not be repaid for 30 years; the term of § 1452b loans cannot exceed 20 years. The first $5,000 of the SBA loan is cancelled and interest on the balance of the outstanding loan is at one percent (1%) per year; there is no comparable provision for cancellation of part of the outstanding principal of § 1452b loans and the rate of interest on § 1452b loans can be as high as three percent (3%) per year. In addition, the SBA's regulations governing disaster relief loans clearly indicate that these loans are considerably more flexible than loans under § 1452b. *See* 13 C.F.R. § 123.

HUD's funding of the rehabilitation aspect of the Project through the use of SBA disaster loans undercuts the plaintiffs' argument predicated on § 1452b(a)(3) that they (plaintiffs) are "unacceptable risks" for rehabilitation loans and, therefore, are entitled to have their properties acquired. 15 U.S.C. § 636(b), coupled with the regulations contained in 13 C.F.R. § 123, provides such liberal terms for disaster relief loans that considerations of "acceptable risk" and "financial feasibility of rehabilitation" become largely insignificant.

Moreover, since SBA loans are intended ". . . to restore a victim's home . . . as nearly as possible to predisaster condition . . . ,"[38] apparently without regard to the extent of the damage (either in absolute amount or as a percentage of assessed value),[39] it cannot be said that rehabilitation is financially infeasible even if the cost of repair exceeds the value of the structure in its pre-flood condition.

## IV. PLAINTIFFS' EQUAL PROTECTION ARGUMENTS

The substance of plaintiffs' equal protection challenge to the South Wilkes-Barre Urban Renewal Project is summarized in plaintiffs' brief as follows:

". . . Plaintiffs object to the unequal burdens being placed upon them of rehabilitating flood damaged property while similarly damaged property

---

**36.** 42 U.S.C. § 1452b(f) provides:

"(f) The Secretary is authorized to delegate to or use as his agent any Federal or local public or private agency or organization to the extent he determines appropriate and desirable to carry out the objectives of this section in the area involved."

**37.** The district court found:

"HUD's Office of Management and Budget determined that the SBA's 1% loan program rather than the § 312 [42 U.S.C. § 1452b] loan program would be the funding source for the rehabilitation work in the Hurricane Agnes disaster-related urban renewal projects. . . ." Finding No. 234.

**38.** 13 C.F.R. § 123.3(a).

**39.** Plaintiffs argue that rehabilitation costs exceeding 75% of value require acquisition since rehabilitation is therefore economically infeasible.

In this connection, they refer to plaintiffs' Exhibit No. 25, a letter written to plaintiff McCullough by John Gibson of HUD, on behalf of the Secretary of HUD. While Mr. Gibson does not explain the source of his 75% guideline, we note that Appendix 1 to RHA 7210.1, Chapter 1, Section 5 provides that property will be subject to acquisition when the rehabilitation cost exceeds ". . . 75% of the cost of constructing new buildings . . . of comparable structure . . . ."

We are not persuaded by plaintiffs' argument for a number of reasons. First, the 75% guideline found in the Handbook Appendix, *supra*, applies to § 1452b loans, not SBA loans. Second, the text of the Appendix clearly indicates that even when rehabilitation is not feasible, there is no requirement that there be acquisition. Third, although the Gibson letter refers to a 75% guideline, nowhere is it even suggested in that letter that acquisition is mandated where rehabilitation is infeasible.

is being acquired as part of the South Wilkes-Barre Urban Renewal Project . . . ."

Plaintiff's Brief at 36–37. Plaintiffs advance three interrelated equal protection arguments: (A) the district court applied an improper concept of equal protection; (B) the content of the Redevelopment Authority's property acquisition criteria create arbitrary and unreasonable distinctions; (C) the Redevelopment Authority has applied its acquisition criteria in an arbitrary and inconsistent manner. We will consider each of these arguments *seriatum.*

A. *Equal Protection Test.*

Plaintiffs' contention that the district court applied an improper concept of equal protection is based upon the following passage in the district court's opinion at 561A.

"In the most recent case . . ., the Supreme Court reaffirmed the traditional notion that where equal protection issues are raised, *the most fundamental rights guaranteed by the Constitution must be involved. . . ."* (Emphasis added.)

From this statement, plaintiffs construct the argument that the district court made only an "insubstantial inquiry" into their equal protection claims since the court was laboring under the mistaken belief that ". . . Plaintiffs' objection to the property acquisition criteria is inappropriate for equal protection consideration because it does not involve a 'fundamental right' . . . ." Plaintiffs' Brief at 35. This argument is wholly devoid of merit. When the portion of the district court's opinion, quoted *supra,* is viewed in the context of the court's over-all equal protection analysis, it is readily apparent that no improper concept of equal protection was applied. Immediately after the above quoted passage, the district court cited *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974) for the proposition that economic and social legislation does not violate equal protection provided ". . . the law be 'reasonable not arbitrary . . . [and bears] a rational relationship to a permissible state objective.'" Not only is this the correct standard for equal protection analysis in the present case but it is, in substance, the same standard which *plaintiffs* urge this Court to apply.[40]

Plaintiffs contend that the proper standard was that articulated by the Supreme Court in *F. S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920) as follows:
". . . [T]he classification must be reasonable, not arbitrary, and must rest upon some ground of difference

---

**40.** Plaintiffs' position is that this is not a case calling for "strict judicial scrutiny" because of the presence of a "fundamental right" or a "suspect classification." *See Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969). Nevertheless, plaintiffs argue that recent decisions have given the "rational basis test" a new emphasis. This emphasis, they urge, requires a close analysis of the classification in question to determine if it bears a *sufficient relationship* to the objectives of the statute involved. *See, e. g., Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 37 L.Ed.2d 349 (1972); *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). The test which plaintiffs urge this Court to apply in the present case was articulated by the Fifth Circuit as follows:
". . . Today . . . the rational relationship standard is relatively strict. Recent

Supreme Court cases teach that the test calls for a serious and genuine judicial inquiry into the correspondence between the classification and the legislative goals." (Footnote omitted.)
*Dorrough v. Estelle,* 497 F.2d 1007, 1011 (5th Cir. 1974), *rev'd,* 420 U.S. 534, 95 S.Ct. 1173, 43 L.Ed.2d 377 (1975) (no reference to the "strict rational basis" test). We believe that the present case does not require an extended analysis of the difference, if any, between the "traditional rational basis test" and the so-called "strict rational basis test." Even under the latter standard, after performing a "genuine judicial inquiry into the correspondence between the classification and the legislative goals", we find no equal protection violation either in the content of the Authority's acquisition criteria or in their application.

having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike . . . ." *Accord, Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). In *Village of Belle Terre v. Boraas, supra,* the case relied upon by the district court here, the Supreme Court referred to both *Royster* and *Reed* in framing its equal protection test. The Court wrote:

". . . We deal with economic and social legislation where legislatures have historically drawn lines which we respect against the charge of violation of the Equal Protection Clause if the law be 'reasonable, not arbitrary' (quoting *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989) and bears 'a rational relationship to a [permissible] state objective.' *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225."

416 U.S. at 8, 94 S.Ct. at 1540. It is thus apparent to us that the district court did not apply an improper concept of equal protection but rather applied the same standard to which the plaintiffs subscribe.

### B. *Arbitrariness of the Acquisition Criteria.*

#### (1) *Damage to a Primary Structural Component*

■ Plaintiffs' challenge to the content of the Redevelopment Authority's property acquisition criteria is two-pronged. Plaintiffs argue (Brief at 47) first that ". . . there is no justifiable reason for determining the eligibility of a property for acquisition because of it being substandard to a degree war-

ranting clearance solely on the basis of the property having severe damage to a primary structural component . . . ." [41] The district court rejected plaintiffs challenge to the acquisition criteria, finding that ". . . the criteria were 'reasonable not arbitrary,' and bore a reasonable relationship to the objective of creating a revitalized South Wilkes-Barre with a minimum expenditure of state and federal funds." We agree with the district court.

This case, like *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) involves the allocation of limited financial resources. As indicated *supra* note 5, the total amount of HUD funds provided under the Loan and Capital Grant Contract was not to exceed $28,293,299. Of this amount, the Redevelopment Authority budgeted $14,750,-000 for property acquisition.[42]

The $14,750,000 figure was based upon an estimated acquisition of 640 parcels.[43] Since the time of the original estimate, the number of properties to be acquired has decreased significantly,[44] thereby resulting in a surplus of several million dollars in the funds allocated for property acquisition.[45] We are not persuaded by plaintiffs' argument that the presence of this surplus makes the *Dandridge* line of cases inapplicable here. What is important is not a current surplus but the fact that, at the time the property acquisition criteria were formulated, the Authority had a limited amount of HUD money with which to maximize rehabilitation in the project area.[46] We thus believe that the following analysis in *Dandridge* is directly applicable here:

---

**41.** The "primary structural component test" used by the Authority to identify those structures substandard to a degree warranting clearance is set forth in the district court's Finding of Fact # 37(a) and reproduced *supra* p. 863.

**42.** Finding Nos. 172–173.

**43.** Finding No. 177.

**44.** Finding Nos. 180, 183.

**45.** Finding No. 187.

**46.** The primary emphasis of the contracting parties in the Loan and Capital Grant Contract was not upon rehabilitation of individual homes, but was rather upon rehabilitation of the area and the community. Section 11 of the contract, among other things, calls for action by the Authority with respect to repair, renewal, construction, or reconstruction of streets, utilities, parks, playgrounds, air right sites, historic properties and the like—all obviously requiring public funds.

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be and unscientific.' *Metropolis Theatre Co. v. City of Chicago,* 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730. 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393."

397 U.S. at 485, 90 S.Ct. at 1161. *Compare Jimenez v. Weinberger,* 417 U.S. 628, 94 S.Ct. 2496, 41 L.Ed.2d 363 (1974). Thus, it is under this standard that the reasonableness of the Authority's property acquisition criteria must be judged.

In arguing that the "damage to a primary structural component" test is arbitrary and unreasonable, plaintiffs contend that this standard fails to identify the most severely damaged properties. Plaintiffs further argue that this test was not consistently used to categorize properties as substandard to a degree requiring clearance.

We are not impressed with plaintiffs' argument. There was no obligation on the Authority to expend its limited funds for acquisition of the *most severely damaged properties.* It was within the Authority's discretion to decide that its resources could be more effectively used in achieving the goal of maximum rehabilitation by acquiring structurally unsound properties, regardless of the severity of their over-all damage. The scope of the Authority's discretion in tailoring its acquisition criteria to the needs of the South Wilkes-Barre Project was limited only by considerations of reasonableness.

We find the Authority's explanation for adoption of the "primary structural component" test eminently reasonable under the circumstances of the present case. In their brief, the state defendants explained the rationale behind this test as follows:

" . . . [The] Authority developed a criteria for the acquisition of substandard structures which would discount or eliminate that damage that was typical and that had occurred to every property that was involved in the flood. The criteria that was developed was aimed at identifying those structures which suffered damage to their structural components . . .."

Brief of the State Defendants at 32. The district court apparently accepted this explanation, incorporating it in Finding No. 47.[47]

The reasonableness of categorizing as substandard to a degree warranting clearance only those properties which were *structurally unsound,* as contrasted with those which were *severely damaged,* is borne out by the availability of SBA loans in the South Wilkes-Barre Project. As discussed *supra* p. 873 the liberal terms of SBA loans made feasible the rehabilitation of even severely damaged properties. It was not unreasonable for the Authority to use the funds available for acquisition to purchase only those properties which sustained structural damage and might, therefore, be dangerous if not cleared. The Authority could make this policy decision with the knowledge that the owners of severely damaged properties would not go without financial assistance but could avail themselves of the SBA loan program.

We note that the proof of damage by the property owners focused on restoration of their properties to a pre-flood

47. *See* p. 863 *supra.*

condition, without regard to the less expensive and minimal requirements of the applicable building codes. The defendants showing that the plaintiffs failed to carry their burden of showing either: (1) *primary structural damage* within the criteria established for acquisition (see p. 863 *supra*); or, (2) costs of rehabilitation to satisfy code standards rather than costs of rehabilitation to restore the properties to their pre-flood condition. In illustrating this latter argument, the defendants refer to the testimony of various plaintiffs about flood damage to double zone air conditioning, built in bars, powder rooms finished with imported tile, hardwood flooring, floor to ceiling mahogany bookcases, and the like. Brief of the State Defendants at 29.

■■■ We recognize that the standards for rehabilitation in an urban renewal and disaster context are substantially different than the standards for rehabilitation reimbursement that might be employed by an insurer [48]—an aspect not present in this case. Despite our sympathy for the property owner who has lost valuable furnishings and has incurred substantial replacement costs, we cannot hold the Authority or the Federal Government to the status of an insurer. Even in the context of disaster losses, to hold that the government had assumed the role of an insurer for all losses would be to require the expenditure of public funds to implement social policy as yet undefined and unlegislated.

Thus, in our view, there was no denial of equal protection in the Authority's adoption of the "primary structural component" criteria to identify properties substandard to a degree requiring clearance.

### (2) *Equation with Obsolete Properties*

■■■ Plaintiffs state the second prong of their challenge [49] to the content of the Authority's acquisition criteria as ". . . there is no justifiable reason for refusing to acquire a flood damaged property which is economically infeasible of rehabilitation while at the same time scheduling for acquisition obsolete properties on the basis of their being economically infeasible of rehabilitation . . .." Plaintiffs' Brief at 47.[50]

The short answer to this argument is that there are policies and factors involved in acquiring properties to remove blighting influences which are different than the policies and factors involved in acquiring properties which are substandard to a degree requiring clearance. The Handbook clearly points up this distinction in Section 7207.1, Chapter 1, Subsection 4 which deals with "Criteria for Treatment of Project Areas". In giving examples of "blighting influences", the Handbook lists:

"1. Inadequate street layout.
2. Incompatible uses or land use relationships.
3. Overcrowding of buildings on the land.
4. Excessive dwelling unit density.
5. Obsolete buildings not suitable for improvement or conversion.
6. Other identified hazards to health and safety and to the general well-being of the community."

By contrast, in defining what is meant by "structurally substandard to a degree requiring clearance" the Handbook makes reference to:

". . . defects in structural elements and/or a combination of deficiencies in essential utilities and facili-

---

48. Our discussion in *Commonwealth of Pennsylvania v. National Association of Flood Insurers, supra,* is somewhat related to the problem presented here and may be of collateral interest.

49. Plaintiffs assert that the district court ignored this aspect of their challenge to the project's property acquisition criteria.

50. Obsolete structures are one type of property eligible for acquisition under the category of "blighting influences." *See* Finding No. 37(c), *supra* p. 863.

ties, light and ventilation, fire protection (including adequate egress), layout and condition of interior partitions, or similar factors, which defects and/or deficiencies are of sufficient total significance to justify clearance . . . ."

It is apparent, therefore, that the considerations underlying "blight" acquisition are vastly different from those underlying "substandard" acquisition. As such, we find no denial of equal protection in the fact that the Authority considers economic suitability for modernization in acquiring properties as *blighting influences* but disregards economic feasibility of rehabilitation in acquiring properties as *substandard to a degree requiring clearance.*

### C. *Application of Acquisition Criteria.*

Plaintiffs contend that the Authority's application of the "primary structural component test" was so arbitrary and inconsistent as to deny them the equal protection of the law. Plaintiffs advance three interrelated "application" arguments: (1) the "primary structural component test" was never actually applied as intended; (2) a number of properties were acquired by the Authority on the basis of being substandard although they did not sustain damage to a primary structural component; (3) properties owned by several plaintiffs sustained damage to a primary structural component but were not scheduled for acquisition. We find none of these arguments persuasive.

### (1) *Primary Structural Component Test*

Plaintiffs base their first argument on the testimony of Mr. Daniel Tracey, chief of the property survey team which inspected the properties in the Project Area. Tracey played a significant role in determining which properties would be acquired as substandard to a degree warranting clearance. Referring to Tracey's deposition, plaintiffs argue that Tracey " . . . indicated that in determining whether a property is substandard to a degree requiring clearance and thus eligible for acquisition, he considered damage to secondary structural components [51] as well as to primary components . . . despite the fact that damage to secondary components was not to have been given any consideration in determining whether a property should be acquired." Plaintiffs' Brief at 60.

We have read the Tracey deposition and cannot agree with plaintiffs' interpretation. When asked what criteria he applied, Tracey repeatedly referred to " . . . the criteria that was [sic] on the . . . form [survey form] [and] . . . that was [sic] approved by the Agency and . . . concurred in by HUD." [52] It is true, as plaintiffs point out, that Tracey at various times admitted considering other than primary structural components.[53] But when asked if an acquisition determination was ever made by him based on severe damage to secondary components, Tracey responded:

> "I don't know of any instances . . . where I made the determination that if the secondary components were severely damaged where that only was enough to acquire the property."

Tracey Deposition at 14. Tracey explained the reason why an evaluation of secondary components appeared on the survey forms used in the South Wilkes-Barre Project. It was " . . . to give us a clearer picture of the overall structure." Tracey Deposition at 32. The district court accepted this explanation

---

**51.** In his deposition, Mr. Tracey distinguished primary and secondary components as follows. Primary components include: ". . . the foundation, the walls, the roof, and the load-bearing elements. . . ." Secondary components include: ". . . the porch, . . . the doors, the windows, the chimneys . . ., the floors, the stairs, the walls, the ceilings, and the three utilities, the plumbing, the electrical, and the heat." Tracey Deposition at 9.

**52.** Tracey Deposition at 10–11.

**53.** *See* Tracey Deposition at 12, 24–25, 32, 44, 47–48.

by finding that "[t]he purpose of classifying damage to secondary components on the survey form was for the general information of the Redevelopment Authority."[54]

In our view, plaintiffs have failed to carry their burden of proving that the "primary structural component" test was not applied as intended because of Tracey's allegedly improper consideration of secondary components. The district court focused on the plaintiffs' shortcoming in this regard when it wrote: ". . . [t]hough Tracey's deposition indicates that he took into account damage to secondary components along with damage to primary components, that does not mean that he scheduled for acquisition properties that did not meet the 'severe flood damage' criterion ['primary structural component test']."

### (2) Acquisition of Properties Not Within Criteria

Plaintiffs' second challenge to the application of the property acquisition criteria by the Authority appears at 61 of their brief as follows: ". . . over 80 properties are being acquired which do not conform either to the acquisition criteria or to the objectives of the Urban Renewal Plan . . . ." Plaintiffs' sole support for this contention comes from a reading of the Property Survey Forms for each of these 80 properties. It is significant that plaintiffs introduced no evidence, aside from these survey forms, to show that the Authority acquired properties which did not meet any of the established acquisition criteria. (See p. 863 supra.) The discrepancies which appear in these Survey Forms cannot alone satisfy plaintiffs' burden of proving that the Authority arbitrarily acquired unqualified properties.

First, the district court took note of these discrepancies in various Findings

of Fact.[55] Nevertheless, the court did not find a denial of equal protection but instead wrote:

". . . The survey forms introduced into evidence indicate that properties without severe flood damage were acquired. However, such properties might well have been acquired because of blighting influences or other admittedly permissible criteria, though not so noted on the form."

District Court Opinion at 562A. We agree with the district court that minor discrepancies in classifications[56] which appear in 80 Survey Forms (out of a potential 4500 forms prepared for structures in the Project Area) do not rise to the level of equal protection violations.

Second, the reason why at least some of these 80 Survey Forms appear to "misclassify" certain properties was explained by Daniel Tracey. He testified in his deposition at 71–72 that even though a particular property was to be acquired because it constituted a blighting influence or was needed for planning objectives, it was conceivable that because of time pressures the Survey Form was marked "substandard warranting clearance."

It is apparent to us, as it was to the district court, that the Survey Forms were not used to keep accurate records as to the reason for the Authority's acquisition of a particular property. As such, it was insufficient for the plaintiffs to rely on discrepancies in these forms, without additional evidence, to prove that the Authority had arbitrarily acquired properties which did not conform to the established acquisition criteria.

### (3) Non-Acquisition of Property Within Criteria

Plaintiffs argue that a number of their properties sustained damage to a primary structural component but were not scheduled for acquisition by the Au-

---

54. Finding No. 284.

55. Finding Nos. 264–271, 273–275.

56. In the wake of a major disaster, it would be unreasonable to expect field surveyors to complete Survey Forms with mathematical precision. See Dandridge v. Williams, supra.

thority. Specifically, plaintiffs refer to two Findings of the district court to support their argument. In Finding No. 60, the district court noted that the property of plaintiffs Mr. and Mrs. Mera sustained cracks in the walls, a primary structural component. In Finding No. 76, the court found that the property of plaintiffs Samuel and Joan Pezzner had "crumbled and cracked . . . walls." Based on those examples, among others, plaintiffs argue that the Authority arbitrarily excluded some of their properties from acquisition even though the particular properties met the "damage to a primary structural component" test.

This argument fails to take into account the fact that although a property may have sustained some damage to a primary structural component, it does not follow that it was automatically entitled to acquisition pursuant to the acquisition criteria. As Tracey explained in his deposition at 12: ". . . one of the elements of a primary component could be severely damaged but that wouldn't make the component itself severely damaged. . . . [I]t was a matter of judgment to determine the extent of damage."

Of far greater significance to us is the fact that despite the Mera and Pezzner findings (Nos. 60 and 76), the district court in its Opinion at 563a found that ". . . the Plaintiffs have not shown that the applicable criteria were misapplied to their properties. . . ." The district court went on to say that ". . . [T]he evidence has simply not convinced this Court that the properties of the Plaintiffs were incorrectly evaluated by the authorities. . . . The Plaintiffs have not carried their burden of showing that their properties were not acquired because of arbitrary and discriminatory

action or action not in accordance with the law. . . ." [57]

Having reviewed all of the plaintiffs' numerous equal protection arguments, we agree with the district court that the burden of proving an equal protection violation was not met by the plaintiffs.

## V. DUE PROCESS

In light of our prior discussion, plaintiffs' due process arguments have lost whatever merit and substantive content they may originally have had.

Plaintiffs argue that it is a denial of due process for an agency to fail to follow its own established procedural rules. In particular, plaintiffs assert that the defendants failed to comply with RHA 7210.1 of the Handbook in administering the Project.

■ As we have stated previously, our interpretation of the Handbook is at variance with plaintiffs' interpretation. Under our reading of the Handbook, even if the defendants had been required to comply fully with every provision of the Handbook, acquisition of plaintiffs' properties would not have been mandated and would not necessarily have resulted. Just as this conclusion defeats the argument of the plaintiffs which was predicated on the Handbook provisions, see pp. 868–872 supra, so it defeats their argument based on due process considerations. See note 26 supra.

Plaintiffs also argue that it was a denial of their due process rights for the federal defendants to "ratify" the Authority's Plan which Plan denied them "equal protection" by not providing for the acquisition of their properties.

The short answer to this last argument is that we have held in an earlier portion of this opinion that no equal pro-

---

57. The Authority employed various safeguards to insure accurate classification of properties. Any property owner who challenged the classification of his property was afforded a resurvey. Mr. Tracey testified that he personally conducted several hundred re-surveys. Tracey Deposition at 36. Such evidence clearly substantiates the district court's finding that:

"If any Plaintiff could demonstrate that his property qualifies for acquisition in accordance with criteria developed by the Redevelopment Authority, such property would be processed for acquisition in the same manner as all other properties which have been scheduled for acquisition." Finding No. 280.

tection rights of the plaintiffs were violated or denied. That holding completely undercuts and vitiates this argument—for absent any equal protection violation, the necessary predicate for plaintiffs' due process argument is lacking.[58]

Accordingly in a due process context, we find no violation of plaintiffs' rights by reason of any action taken by the defendants.

## VI.

Under our analysis the plaintiffs are not entitled to the only relief they seek: an order from the court that the defendants acquire their properties. Since that relief is unavailable and the Project is now in the post-contract stage, *see* page 872 *supra*, we see no reason why the defendants should be ordered to comply with Handbook provisions intended for pre-contract application. We will therefore reverse with the direction that the district court vacate so much of its judgment (Paragraph 1) of June 27, 1974 as requires compliance with the Handbook, and we will affirm the balance of the judgment (Paragraph 2), there being no constitutional, statutory, or Handbook basis on which any of plaintiffs' arguments can be sustained. In accordance with these dispositions we direct that the district court enter judgment without exception for the defendants on all claims. Each party will bear its own costs.

## APPENDIX I

## SECTION 6. DETERMINING FEASIBILITY OF PROPERTY REHABILITATION

The feasibility of rehabilitation means that, for the majority of the properties in the area, there is reasonable evidence that rehabilitation up to the LPA's Property Rehabilitation Standards can be supported by incomes of owner occupants or by rental revenue.

The physical and financial feasibility of renewing individual properties shall be determined on the basis of (1) property surveys, and (2) family surveys or other appropriate investigations. These surveys shall also be the basis for the establishment of PRS.

## PROPERTY SURVEYS

Prior to submission of the Survey and Planning Application, a limited exterior survey shall be made to reach a preliminary judgment as to the suitability of rehabilitation treatment for the area. This survey may be accomplished by driving or walking through the proposed area. Existing data shall be utilized to the fullest extent possible.

Early in the planning stage, a survey shall be made of the exterior and interior of a limited number of typical properties. This survey will provide information which the LPA, in collaboration with HUD will use to formulate tentative PRS and to make a preliminary judgment on the economic feasibility of rehabilitation. Arrangements may be made through the Regional Office for HUD assistance in making this survey.

Prior to submission of the Part I Loan and Grant Application:

(1) An exterior survey shall be made of all properties in the area for the purpose of classifying them as standard, capable of rehabilitation, or requiring clearance.

(2) An interior survey shall be made of properties that cannot be so classified through exterior examination, if necessary to reduce the number of unclassified properties to a reasonably small proportion of the total number.

Prior to authorization of the Contract for Loan and Grant, HUD will concur in

58. We express no opinion as to the validity of plaintiffs' "due process-ratification" theory. We dispose of this issue solely on the basis of plaintiffs' failure to prove an element which would be necessary to sustain this argument.

the initiation of final property surveys to determine specific improvements required to meet PRS (see 7210.1, Rehabilitation, Chapter 1, Section 8), under the following conditions:

(1) The Regional Office has approved the proposed PRS.

(2) Planning of the project has advanced to the point that the LPA has identified a substantial number of properties which are to be retained.

(3) The survey is limited to the properties proposed to be retained.

(4) There is satisfactory evidence of organized understanding of and support for the project.

After final property surveys have been completed, written notification of specific improvements required may be sent to owners of property to be retained.

Property surveys shall be conducted by qualified personnel experienced in building construction, costs, and property values.

## FAMILY SURVEYS

Prior to submission of the Part I Loan and Grant Application, family surveys may be made to obtain information on the financial feasibility of improving properties to PRS. Financial feasibility includes (1) debt-carrying capacity of owners, and (2) for investment property, the relationship of anticipated increases in income or value to the costs of the proposed improvements.

Family surveys shall be conducted by qualified personnel experienced in interviewing and survey techniques. The number, scope, and extent of the surveys shall be kept to the essential minimum by using existing data to the fullest extent possible.